RONNY H. POTTER, as Ex'r of the Estate of Melvin H. Potter, Deceased, Plaintiff and Counterdefendant-Appellant, v. KENNETH POTTER *et al.*, Defendants and Counterplaintiffs-Appellees.

Second District   No. 2—86—0788

Opinion filed August 6, 1987.—Rehearing denied October 14, 1987.

Narusis & Narusis, of Cary (Bernard V. Narusis, of counsel), for appellant.

Swanson & Rominski and Charles M. May, Ltd., both of Waukegan (Barbara Swanson Rominski, of counsel), for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Ronny H. Potter, as executor of the estate of Melvin Potter, appeals from an order by the circuit court of Lake County granting defendants' motion to dismiss this action pursuant to section 2—619(a)(9) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—619(a)(9)).

O. W. Potter & Sons, Inc., was created in 1948 by the brothers, Melvin Potter and Kenneth Potter, and their father, O. W. Potter. The corporation engaged in the construction business from its Wauconda, Illinois, offices until about 1966. The father and two sons each owned one-third of the outstanding corporate shares. Prior to his death in the early 1970s, the father transferred all of his shares of stock in the corporation, in equal shares to the brothers, with the result that each of them thereafter owned 50% of the corporation. Melvin Potter was president from 1948 until his death on January 16, 1982. Defendant (Kenneth) has been secretary/treasurer from 1964 to the present time. After the father's death, the brothers were the only corporate directors. Defendant served as the corporate bookkeeper from approximately 1965 to the present time. As such, he filled out the vast majority of corporate tax returns, including the 1980 tax form which is central to this litigation.

Since the late 1940s, the corporation has owned a parcel of commercial and industrial real estate at 400 West Liberty Street in Wauconda, Illinois, with buildings located on the rear portion of the premises which have been rented to industrial/commercial tenants. Sometime during the period 1964 through 1966, the corporation obtained a $34,000 mortgage loan and constructed a Dog-N-Suds drive-in restaurant on that part of the premises which fronts on Illinois Route 176. Shortly thereafter, the corporation terminated its construction activities and became solely engaged in the Dog-N-Suds restaurant business and the rental of the buildings on the rear portion of the premises.

From 1966 to Melvin's death in 1982, defendant managed the

Dog-N-Suds operation of the corporation, for which he received a regular salary. Defendant's wife, Merry, was employed as a cook and carhop at a regular salary. Defendant operated the Dog-N-Suds business from 1966 to 1982 as if it were his own.

Until Melvin's death in 1982, the net rentals from the building on the rear portion of the premises were divided equally between the brothers. After the aforesaid mortgage on the Dog-N-Suds construction was paid off in 1976, Melvin received 3% of the adjusted annual gross sales of the Dog-N-Suds restaurant business.

Melvin died on January 16, 1982, leaving two sons, Ronny and Duray Potter, as his only heirs. Shortly after their father's death, Ronny and Duray received a letter from attorney Albert Salvi on behalf of the defendant which claimed that in 1953, the brothers entered into an alleged agreement under the terms of which the survivor had agreed to purchase the decedent's corporation shares based on "the net worth as shown on Federal income tax returns of the corporation for the fiscal year" preceding the decedent's death.

A photocopy of the alleged buy-sell agreement was enclosed in the letter. The purported agreement provided for a tender of an installment judgment note in the amount computed from the corporation's net worth as stated in the preceding year's Federal income tax return.

Attorney Salvi's letter stated, among other things, that under the aforesaid alleged agreement, "Mr. Kenneth Potter must tender and does so by this notice the sum necessary to purchase your father's stock." The letter contained no judgment note or payment of any kind.

On September 1, 1983, this suit was filed in the circuit court below by Ronny Potter as executor of the estate of Melvin Potter, deceased, against defendant and the corporation seeking: (1) an accounting of all receipts, disbursements, and transactions of the corporation and of the defendant covering the period from 1962 to the date thereof, and (2) a judgment in favor of the corporation and against the defendant Kenneth A. Potter in an amount equal to the sums misappropriated by the defendant from the corporation during the period from 1962 to the date of the lawsuit and for other related relief. No answer to the complaint was filed by the defendants.

On October 5, 1983, defendant filed a counterclaim which alleged the existence of a buy-sell agreement between himself and his deceased brother, previous offers to pay the contract price for Melvin's shares of stock upon delivery thereof, the deposit of a judgment note in the principal sum of $38,779.01 with the clerk of this court, and

prayed for specific performance of the alleged buy-sell agreement.

Plaintiff's answer to the counterclaim demanded strict proof of the alleged buy-sell agreement. The plaintiff's answer also alleged that the defendant spent corporate funds for his own personal purposes, falsely showed personal expenditures on the books and tax returns of the corporation, systematically paid all corporate profits to himself, thereby preventing any accumulation of the corporation's net worth and thereby diminished the actual value of the plaintiff's corporate shares. In addition, plaintiff's answer alleged that the corporate Federal income tax returns did not accurately reflect the financial affairs of the corporation and its book value because defendant (Kenneth) had manipulated the corporate records and Federal income tax for many years and that he was therefore estopped from maintaining his counterclaim. Plaintiff further charged that the 1981 Federal income tax return which was prepared by defendant showed land and building values of $28,313.19, whereas their actual value was approximately 1,000% more.

Defendant's reply to answer to counterclaim asserted that an agreement existed between the two brothers for the years 1966 to 1976, under the terms of which the defendant was to devote his full time and effort to the Dog-N-Suds restaurant business, pay mortgage indebtedness, taxes and insurance thereon, and receive all restaurant income "as salary and wages." In return, it was alleged that Melvin was "relieved of any personal obligations with regard to the corporate operations" and would receive the benefit of having the Dog-N-Suds mortgage, real estate taxes, and insurance paid. Defendant further claimed that in 1976 after the mortgage had been paid in full, Melvin expressly agreed to accept the sum of 3% of the Dog-N-Suds gross sales (after sales taxes were first deducted) "as his share of the corporate proceeds" plus one-half of the rentals from commercial-industrial buildings on the rear of the corporate premises.

Pursuant to section 2—619(a)(9) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—619(a)(9)), defendant moved to dismiss the plaintiff's first amended complaint on the grounds that the plaintiff's claim was barred by "affirmative matter defeating such claim," i.e., the buy-sell agreement alleged in the defendant's counterclaim aforesaid.

Defendant also filed a supplemental motion to dismiss the plaintiff's first amended complaint on three additional grounds, namely, (1) that plaintiff, as shareholder, was without standing to bring a derivative action, (2) that all causes of action accruing more than five years preceding the commencement of this action were barred by the stat-

ute of limitations, and (3) that plaintiff was guilty of *laches.* On April 16, 1986, the trial court entered an order dismissing plaintiff's complaint as to all causes of action accruing more than five years preceding Melvin's death (1982) and denying the remainder of the allegations in the supplemental motion to dismiss. Leave was given plaintiff to file an amended complaint.

On April 23, 1986, plaintiff filed his first amended complaint, which additionally alleged that defendant concealed the true nature of the corporate expenditures by falsely showing them on the corporate books as corporation expenses and loans. Defendant filed no answer to the first amended complaint.

The trial court and the parties agreed that the trial could commence with the defendant's presentation of evidence on the issue of the buy-sell agreement that was raised by his motion to dismiss and his counterclaim. The scope of the evidence adduced during defendant's presentation was enlarged and, by stipulation, was to be received also as evidence on the issues raised by the pleadings on the first amended complaint and answer to defendant's counterclaim.

Trial of the issues occurred on April 28, 1986, May 20, 1986, and May 29, 1986. On May 29, 1986, the trial court entered an order finding that on October 26, 1953, the brothers did enter into a valid and binding buy-sell agreement, that defendant, Kenneth, offered to purchase the decedent's shares of stock pursuant to the terms of that agreement but that the estate did not act to implement the agreement, and accordingly, the court dismissed the plaintiff's first amended complaint.

Thereafter, on June 24, 1986, plaintiff moved to vacate the trial court's order of May 29, 1986, on the ground that the trial court's finding regarding the buy-sell agreement was not material or relevant to the misappropriation issues alleged in the first amended complaint, that the trial court's finding regarding the buy-sell agreement was not supported by the evidence, that the evidence required findings of misappropriation by the defendant, and judgment in favor of the plaintiff on the first amended complaint.

On July 30, 1986, the trial court entered an order finding that the defendant was not guilty of any misappropriation, that the buy-sell agreement was valid and binding on the parties, that the net worth of the corporation as set forth in the 1980 Federal income tax return was $54,086.95, that one-half of said sum represented the amount due from Kenneth for Melvin's shares of stock, and entered judgment in defendant's favor and against the plaintiff on the issues raised by the pleadings. This appeal followed.

On appeal, plaintiff asserts the following issues: (1) the trial court's finding that defendant did not misappropriate any corporate funds is contrary to the manifest weight of the evidence; (2) the trial court's finding that the brothers entered into a valid and binding buy-sell agreement is contrary to the manifest weight of the evidence; (3) the trial court's finding that the defendant diligently tendered performance under the alleged buy-sell agreement is contrary to the manifest weight of the evidence; (4) the trial court erroneously held that plaintiff's action to recover allegedly misappropriated corporate funds more than five years prior to this cause's commencement is barred by the five-year limitation period; and (5) the trial court's finding net worth of the corporation to be $54,084 at the relevant time was contrary to the manifest weight of the evidence.

We first address the issue of whether the trial court's decision regarding the validity of the alleged buy-sell agreement was against the manifest weight of the evidence. A reviewing court is empowered to reverse the trial court's findings when those findings are contrary to the manifest weight of the evidence. (*Burge v. Morton* (1981), 99 Ill. App. 3d 266.) When the evidence is merely conflicting, the reviewing court will not disturb the trial court's ruling. *People v. Crowell* (1973), 53 Ill. 2d 447.

Plaintiff argues that the trial court's decision regarding the validity of the alleged 1953 buy-sell agreement was not supported by the evidence. Plaintiff claims that defendant did not know who drafted the agreement or who was present at the time of signing. Further, he contends there is no evidence in the record that the decedent ever acknowledged the existence of the buy-sell agreement to any person during his lifetime. Plaintiff also points to conduct by defendant which is inconsistent with his assertion that the agreement is valid and binding, *e.g.*, in 1983, plaintiff and defendant jointly entered into a written real estate listing agreement for the sale of real estate owned by the corporation.

Defendant counters these assertions with the evidence adduced at trial. The agreement itself was admitted into evidence over plaintiff's objection that the evidence did not support said admission. A graphoanalyst compared Melvin's signature in the document with his signature on other documents and found the disputed signature to be his. Also, an insurance salesman who did business with O. W. Potter & Sons, Inc., for 15 to 20 years testified that he had discussions with the brothers regarding an insurance policy which related to the buy-sell agreement and that the purpose of the policy was to fund the buy-sell agreement. Also, defendant had admitted into evidence the

carbon copy of a letter he had written to Melvin Potter. The letter, which was dated July 12, 1976, stated that defendant was sending three copies of the October 26, 1953, buy-sell agreement in order for Melvin to furnish a copy to the latter's two sons.

We find the evidence adduced at trial, while conflicting, supports the trial court's decision that the October 26, 1953, buy-sell agreement was valid and binding on the parties.

■ We next address plaintiff's assertion that the trial court's finding that defendant did not misappropriate any corporate funds is contrary to manifest weight of the evidence. Plaintiff argues that defendant's misappropriations are solidly documented at the hearing record. The evidence alluded to by plaintiff is far too extensive to be repeated here. However, of particular importance are: a lump-sum payment of $8,864.74 in the restaurant's profits to defendant's wife, Merry; a sum of $33,000 given by defendant as secretary/treasurer to himself and charged to the personal account of the proprietor; $9,050.09 charged to convention expenses; $6,483.09 in various car expenses. Regarding each of these amounts, plaintiff asserts that they are examples of defendant, as corporate officer, appropriating corporate property to himself for his own individual purposes. See, *e.g.*, *Voorhees v. Mason* (1910), 245 Ill. 256.

In our view, defendant responded to each of plaintiff's allegations with sufficient evidence to demonstrate that the expenditures were appropriate within the corporate context.

■ Plaintiff further points to the admissions of defendant that he treated the Dog-N-Suds operation as if it were his "own business" as evidence of breach of the latter's fiduciary duty. He asserts that defendant did not carry his burden of proof in alleging that the decedent and defendant had entered into express oral contracts which lasted from 1966 to 1982 and provided that whatever corporate profits were remaining after the payment of bills and expenses rightfully belonged to the defendant as compensation. Defendant responds that the decedent, who under the express oral contract received 3% of the restaurant's gross sales, had ample opportunity to remedy any dissatisfactions he had with the arrangement. We find no evidence that the decedent expressed dissatisfaction with the agreement.

From all evidence presented at the hearing, we conclude that the trial court's finding that defendant did not misappropriate any corporate funds is not contrary to the manifest weight of the evidence.

Regarding the third issue of this appeal, the trial court ruled that the net worth of the corporation as is set forth in the relevant 1980 Federal income tax return was $54,086.95 and that one-half that

amount was payable by defendant to decedent's estate. Plaintiff contends that the trial court could not find the corporation's net worth "as shown on the Federal income tax return," because the corporate income tax return does not contain a line for net worth. For purposes of this opinion, we are defining net worth as the difference between the corporation's total assets and liabilities. (Black's Law Dictionary 542 (5th ed. 1983).) A careful review of the corporation's 1980 Federal tax return reveals no line on which to list the corporation's net worth. There is a line item for total assets, line F on page 1, which, in our understanding, is different than the term "net worth." For example, depreciation of assets decreases the amount of total assets listed on line F of the 1980 Federal corporate tax return. Net worth as defined above does not contemplate the depreciation of assets. Thus, we find this language of paragraph 4 of the contract which refers to the "net worth" as shown on the Federal income return for the last fiscal year is ambiguous.

■■ ■ A contract is ambiguous when the language is reasonably susceptible to more than one meaning. (*W. H. Lyman Construction Co. v. Village of Gurnee* (1985), 131 Ill. App. 3d 87.) Clearly, the disputed phrase in paragraph 4 of the agreement is susceptible to more than one interpretation. Accordingly, it becomes the task of the trial court and this court to construe the contract and give effect to the parties' intent. (*Braeside Realty Trust v. Cimino* (1985), 133 Ill. App. 3d 1009.) In order to discover the intent of the contracting parties, the various provisions of the contract must be reviewed as a whole. 133 Ill. App. 3d 1009, 1011.

The buy-sell agreement is comprised of four paragraphs. The first paragraph states that if Melvin receives a *satisfactory offer* for any or all shares of the stock in O. W. Potter & Sons, Inc., owned by him from a proposed purchaser other than Kenneth, he will give Kenneth notice of the offer. This paragraph goes on to delineate the circumstances of the notice and Kenneth's rights in response thereto. Paragraph 2 describes what shall occur if Kenneth receives a satisfactory offer for his shares. Paragraph 2 is essentially identical to paragraph 1.

For purposes of this opinion, we focus upon the term "satisfactory offer," used in paragraphs 1 and 2. It seems evident that for an offer to be satisfactory to either brother, it would have to reflect the net worth (total assets minus total liabilities) of the corporation rather than the total assets as determined in the Federal corporate income tax return. For instance, they would most likely want the purchase price to reflect actual value of the restaurant rather than depreciated

value as listed in the Federal income tax return. In virtually all circumstances the net worth would be greater and, therefore, more equitable than total assets as stated in the Federal income tax return.

Paragraph 3 deals with the death of either brother and the right of the survivor to purchase the shares of stock. This paragraph states that the price shall be computed in accordance with paragraph 4. The other terms of payment are not essential to this determination. Paragraph 4, as stated above, addresses the computation of the price to be paid for the shares of the deceased, as follows:

"(a) the net worth as shown on the federal income tax return of the corporation for the last fiscal year preceding the death of Melvin or Kenneth shall be divided by the number of shares outstanding and the result shall be the price per share;

(b) the price per share shall be multiplied by the number of shares owned by the deceased and the total shall be the price to be paid by the survivor for the shares of the deceased."

■ Relating this language to that of paragraphs 1 and 2, specifically the phrase "satisfactory offer," we find that the intent of the parties was to arrive at a value which reflected the actual worth of the corporation, as opposed to one which was the result of the manipulations (*e.g.*, depreciation of assets) dictated by Federal tax laws. This seems particularly true considering that in all probability the shares of stock involved constituted a significant part of each brother's estate. It is improbable that either brother would seriously contemplate using a method of determining the value of the corporation which would reduce the amount of money his heirs or survivors would receive, *i.e.*, total assets as determined by the Federal income tax form. We construe the intent of the parties with respect to the language in paragraph 4 to mean the net worth of the corporation is the basis by which to compute the value of the shares. As a result, we find that the trial court erred in finding that the value of the O. W. Potter & Sons, Inc., corporation was $54,086.95.

■ Defendant argues that this court should uphold the trial court's construction of the contract language and its determination of the corporation's net worth in 1980 to be $54,086.95. The party alleging a contract has the burden of proving it. (*Greenwood v. Commercial National Bank* (1955), 7 Ill. 2d 436.) Also, the burden of establishing the terms of the contract falls on the party alleging them. (*Dixon National Bank v. Neal* (1955), 5 Ill. 2d 328.) Here, defendant had to prove by a preponderance of the evidence that the phrase in paragraph 4 of the agreement means what he claims it does. He points to the testimony of Paul Kamschulte, a certified public account-

ant, who testified that the net worth of the corporation on the 1980 Federal tax return was $54,086.95, as reflected on page 4, schedule L. (We note here that there is no such figure on page 4, schedule L.)

Defendant conveniently ignores his own testimony that on May 1, 1982, a mere 3½ months after the death of his brother, he figured the combined value of the corporation, restaurant, rental property, and vacant land at $291,000. Further, he fails to mention that in 1983 he entered into a written real estate agreement with plaintiff to sell the corporation's property through Baird and Warner Realty. The listing price of $275,000 was suggested by the Baird and Warner salesperson. There was no evidence presented which indicated these properties were subject to any mortgages or other encumbrances. These figures for the corporate property, while only estimates, are reflective of the actual value of the principal corporate assets. These figures adduced by defendant confirm our view that in making up the 1953 agreement, the brothers contemplated a share price computation based on the actual net worth of the corporation, not the total assets as found in the Federal tax form.

As a result of our finding, we do not need to address the issue raised by plaintiff which contests the trial court's finding that defendant diligently tendered performance under the buy-sell agreement.

Finally, plaintiff asserts that his derivative action to recover misappropriated funds was not barred by the five-year statute of limitations. (Ill. Rev. Stat. 1985, ch. 110, par. 13—205.) He cites no case authority to bolster his argument. Defendant correctly directs our attention to *In re Estate of Kunz* (1972), 7 Ill. App. 3d 760, 763, in which the court stated, "Reviewing courts are entitled to have the issues clearly defined, to be cited pertinent authorities and are not a depository in which an appellant is to dump the entire matter of pleadings, court action, argument, and research as it were, upon the court." With these words in mind, we affirm the trial court's ruling that plaintiff's derivative action to recover misappropriated funds is barred by section 13—205. Ill. Rev. Stat. 1985, ch. 110, par. 13—205.

For the reasons stated above, we reverse the trial court's decision as to the net worth of the corporation and remand this cause for further proceedings to determine the net worth of the corporation and to make appropriate order(s) consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

REINHARD and UNVERZAGT, JJ., concur.